FILED
2016 Apr-04  AM 10:25
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# MIDDLE DIVISION

| | | |
|---|---|---|
| BILLY W. REID, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Case No.  4:14-cv-01424-AKK-HGD |
| | ) | |
| SERGEANT BRIAN STREIT, et al., | ) | |
| | ) | |
| Defendants | ) | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, Billy W. Reid, has filed a *pro se* complaint seeking compensatory and punitive damages, as well as declaratory relief, pursuant to 42 U.S.C. § 1983, for alleged violations of his civil rights.   Named as defendants in the complaint are Sergeant Brian Streit and Deputy Jonathan Weber of the Jefferson County Sheriff's Department.  In accordance with the usual practices of this Court and 28 U.S.C. § 636(b)(1), the complaint was referred to the undersigned magistrate judge for a preliminary report and recommendation. *See McCarthy v. Bronson*, 500 U.S. 136 (1991).

# I. Procedural History

On July 2, 2015, the court entered an Order for Special Report directing that copies of the complaint (doc. 1), and amendment to the complaint (doc. 15),  be forwarded to the named defendants and that the defendants file a special report addressing the factual allegations contained therein.  (Doc. 18).  The order advised the defendants that the special report could be submitted under oath or accompanied by affidavits and, if appropriate, the court would considered it a motion for summary judgment filed pursuant to Rule 56 of the Federal Rules of Civil Procedure.  *Id*.  The order advised the plaintiff that, after he received a copy of the special report, he would have twenty days to submit certain initial disclosures such as the name of any person with personal knowledge of facts relevant to his claims, a clear and legible copy of all relevant documents, and a clearly-stated computation of any category of damages claimed.  *Id*.   On July 23, 2015, the plaintiff filed a document titled "Notification, Disclosure, Discovery, and Motion for Summary Judgment," in which he states he agrees with the summarization of his claims as set forth by the court in the Order for Special Report, and in which he asserts certain factual allegations under penalty of perjury pursuant to 28 U.S.C. § 1746.  (Doc. 19).   In that pleading, he also seeks summary judgment on his claims against the defendants.

The defendants filed their special report on September 30, 2015, accompanied by affidavits, certain medical documentation pertaining to the plaintiff's injury, and a DVD of the July 30, 2012, interview of the plaintiff at the Forestdale Substation. (Doc. 24). On November 25, 2015, the plaintiff was notified that the defendants' special report would be construed as a motion for summary judgment, and the parties were notified that they would have twenty-one days to respond to the respective motions for summary judgment, including filing affidavits or other material if they chose. (Doc. 26).  The parties were advised of the consequences of any default or failure to comply with Fed. R. Civ. P. 56. *Id. See Griffith v. Wainwright*, 772 F.2d 822, 825 (11th Cir. 1985).   On December 15, 2015, the defendants submitted a response to the plaintiff's motion for summary judgment, (doc. 27), and on March 7, 2016, the plaintiff filed a reply (doc. 33) to the defendants' response.   This matter is now before the court on the plaintiff's motion for summary judgment (doc. 19), the defendants' response thereto (doc. 27), the plaintiff's reply to the defendants' response (doc. 33) and the defendants special report (doc. 24) being construed as a motion for summary judgment.

## II. Standard of Review

Rule 56 of the Federal Rules of Civil Procedure governs the resolution of the parties' respective motions for summary judgment.  Under Rule 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id.* at 323.  The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish there is a "genuine issue for trial." *Id.* at 324.  (citation and internal quotation marks omitted).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S.H. Kress &*

*Co.*, 398 U.S. 144, 157, (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor).  Any factual disputes will be resolved in non-moving party's favor when sufficient competent evidence supports that party's version of the disputed facts. *See Pace v. Capobianco*, 283 F.3d 1275, 1276-78 (11th Cir. 2002) (a court is not required to resolve disputes in the non-moving party's favor when that party's version of the events is supported by insufficient evidence).   However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mtn. Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989)).  Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

### III. Summary Judgment Facts

The following facts are undisputed, or if disputed, are viewed in a light most favorable to the non-moving party:

On July 30, 2012, the defendants, along with other officers, went to the plaintiff's residence to question him about allegations made by his former girlfriend

that he had beaten and raped her and held her against her will two days earlier. (Doc. 24-1, at 2-3, ¶ 4).  When the officers arrived, the plaintiff ran out his back door toward a wooded area behind his house.  *Id*. at 3, ¶ 5; Doc. 24-2 at 3, ¶ 5.  Defendant Webber used a taser gun on the plaintiff, who then fell to the ground and was detained. *Id*.[1]  The plaintiff contends that as he fell, he "severely aggravated" a hand injury he had suffered a few days earlier. (Doc. 19 at 3; Doc. 33 at 2 and 4).[2]  Webber then transported the plaintiff to the Forestdale substation to be questioned, while Sergeant Streit proceeded to obtain a warrant to search the plaintiff's premises.  *Id*.[3] On the ride to the Forestdale substation, the plaintiff states that he "continuously complained about the re-injury and the acute pain" he was experiencing.  *Id*.

Upon his arrival at the Forestdale substation, the plaintiff continued to complain about the injury to his hand, and acknowledged that he had not seen a doctor up to that point, but stated he had an appointment scheduled for the next day. (Doc. 24-2 at 3, ¶ 7).  Based on instructions from Sergeant Streit, Webber contacted

---

[1] The defendants contend the plaintiff ignored repeated warnings to stop.  However, the plaintiff states that he mistook the deputies as intruders because they never identified themselves until he had been tased and was lying on the ground. (Doc. 33 at 4).  He denies the deputies ordered him to stop before using the taser gun. *Id*.

[2] The plaintiff's former girlfriend advised Sergeant Streit that he (the plaintiff) had broken his hand on July 27, 2012, when he punched a wall during an argument. (Doc. 24-1, ¶ 4).  The plaintiff acknowledges that he "originally injured his hand (fist) when he hit the wall at his home in frustration." (Doc. 15).  However, he contends the hand was "re-injured" when he fell in his backyard while being detained by Deputies. *Id*. and Doc. 19 at 3.

[3] These events initially transpired at approximately 8 p.m. (Doc. 33 at 4; Doc. 19 at 5).

the Forestdale Fire Department and asked them to send a paramedic to examine the plaintiff's hand. *Id*., ¶ 8; Doc. 24-1 at 3, ¶ 7.  The paramedics confirmed the plaintiff's hand was broken and recommended he be seen by a physician.  *Id*. at ¶ 9.[4]  Despite these instructions, the plaintiff was not provided medical care.  Instead, Webber again contacted Sergeant Streit for instructions and was told that the plaintiff could be taken to the hospital after he (Streit) arrived and conducted an interview. (Doc. 19 at 3).  Upon his arrival at the substation sometime later, Sergeant Streit informed Webber that the plaintiff could be taken to the hospital after the interview was completed. *Id*. at ¶ 10; Doc. 24-1 at 3-4, ¶ 8.[5]

---

[4] The plaintiff states that his injured hand "was swollen twice the size of the other[,] and the end of the broken bone could be plainly seen pushing up the skin in a point." (Doc. 15).  He states that the paramedics recommended his transport to the hospital "immediately." *Id*.  Although Deputy Webber acknowledges the paramedic's recommendation that the plaintiff be seen by a doctor, he denies being told to transport him to the hospital "immediately." (Doc. 24-2, p. 3, ¶ 9). Sergeant Streit also denies being told that the plaintiff needed to be transported "immediately" to the hospital. (Doc. 24-1, at 5, ¶ 13).  In any event, the defendants point to no evidence in the record that the plaintiff received any medical care or pain relief from the paramedics.  In fact, the plaintiff testifies without refute that the paramedics informed him and Webber that "the re-injury was likely a compound and displaced fracture that was beyond their capabilities and equipment to diagnose and treat." (Doc. 33 at 5, ¶ 27).  A Sheriff Department incident report corroborates the plaintiff's testimony, stating that paramedics "advised that there was nothing they could do for Reid." (Doc. 19 at 5).

[5] The plaintiff states that he was informed by Streit that that he would not be provided medical care until he had provided them "with a 'satisfactory statement,' despite the obvious redness [,] swelling and protruding bone." (Doc. 19 at 3).  He states that the *Miranda* warning as seen on the video was "a deceitful ruse," and that "Streit made it clear to [him] that if [he] refused to talk [he] would not be given prompt medical attention." (Doc. 33 at 5, ¶ 26).  Although the plaintiff was initially detained at approximately 8 p.m., Streit did not begin the interview until more than four (4) hours later at 12:31 a.m. (Exhibit 3, DVD, at 6:56).  The plaintiff testifies that part of the long wait was also caused by Streit taking "time out to eat a fast food meal." (Doc. 33 at 5, ¶ 30).  In any event, the defendants fail to adequately explain why the plaintiff could not have received some medical care during the four hour period between the time he was detained and the time Streit began the video interview.

Sergeant Streit testifies that during the interview the plaintiff "confirmed that he had broken his hand when he had hit a wall a few days earlier," and acknowledged he had not yet seen a doctor about the injury. (Doc. 24-1 at 4, ¶ 9).  Streit alleges the plaintiff occasionally used his broken hand during the interview, such as "when he was describing his sexual relationship with [the former girlfriend], when he grabbed his keys, and when he was using his phone to show [him] some texts." *Id*.[6]  After interviewing the plaintiff, and based upon evidence obtained from the plaintiff's residence, Streit determined there was probable cause to arrest him on charges of rape, kidnapping, and domestic violence. *Id*. at ¶ 10.  He then instructed Webber that he could transport the plaintiff to the hospital once the necessary arrest paperwork was completed. *Id*. at ¶ 11.

---

[6] Any suggestion by Streit that the plaintiff did not display evidence of serious and painful injury during the interview is unfounded.  A DVD of the interview is attached to the Defendants' special report as Exhibit 3.  The DVD shows the plaintiff bent forward at the waist and holding his injured hand in his lap and/or cradled in the other hand for almost the entire one-hour video, although he uses the injured hand to gesture on a few occasions.  He appears to grimace in pain at times during the video and tells Sergeant Streit at one point that he is hurting so bad it "has [him] shaking." (DVD at approximately 4:00).  When asked to sign paperwork, the plaintiff explains that he has to sign with his left hand (DVD at approximately 8:20), and tells Sergeant Streit that he wishes they could have conducted the interview "after I went to the hospital," and that he has "been dying" from pain. (DVD at approximately 10:17).  In fact, Streit verbally acknowledges the injury and tells the plaintiff he will be taken to Cooper Green Hospital "once we get through here." (DVD at approximately 4:10). It is readily apparent from viewing the video that the plaintiff is suffering and in pain the entire time; pain that he describes as "excruciating." (Doc. 33 at 6; Doc. 15 at 3; Doc. 19 at 3).

At that point, the plaintiff was taken to a holding cell, but was not placed in handcuffs in deference to his injury. *Id*. at 5, ¶ 12.[7] The defendants allege the plaintiff eventually escaped from the holding cell through a window and was not captured until two weeks later by U.S. Marshals.   *Id*. at 5, ¶¶ 12 and 14. The plaintiff states however that he had opened a window in order to smoke a cigarette, prompting deputies to believe he had escaped.   He then merely walked out the door of the substation behind the deputies as they ran out ahead of him. (Doc. 33 at 5, ¶ 29).[8]  By this time it was approximately 2:30 a.m., six hours after the time the plaintiff had been transported to the substation. *Id*.at ¶28.

After leaving the substation, the plaintiff walked home and "over-medicated" himself with Lortabs to address the "excruciating" pain he was experiencing, causing him to fall into a "deep sleep." (Doc. 33, at 6, ¶ 32).   When he awoke, he drove himself to the Walker Regional Hospital emergency room, but was allegedly refused medical attention because "[he] could not pay cash [or] show proof of insurance."  *Id*. Following his capture on August 15, 2012, the plaintiff underwent orthopedic surgery

---

[7] On this point there is also some dispute.  The plaintiff states "he was never locked in a holding cell … because the deputies said they did not have a key." (Doc. 33 at 5, ¶ 29).

[8] The defendants state that a strong thunderstorm at the time resulted in poor visibility which prevented the plaintiff's immediate capture. (Doc. 24-1 at 5, ¶ 12; Doc. 24-2, at 4, ¶ 12).

to reset the bone and to "stabilize it with a titanium plate and screws." (Doc. 15).[9]

The plaintiff contends his hand is now "permanently impaired." (Doc. 19 at 3).

## IV. Analysis

The Supreme Court has recognized that the Due Process Clause "require[s] the responsible government or governmental agency to provide medical care to persons … who have been injured while being apprehended by the police," and that the due process rights of such persons "are at least as great as the Eighth Amendment protections available to a convicted prisoner." *City of Revere v. Massachusetts General Hosp.*, 463 U.S. 239, 245 (1983).   Therefore, "[a]n officer violates a detainee's Fourteenth Amendment right to due process if he acts with deliberate indifference to the serious medical needs of the detainee." *Crosby v. Monroe County*, 394 F.3d 1328, 1335 (11th Cir. 2004); *citing Lancaster v. Monroe County*, 116 F.3d 1419, 1425 (11th Cir. 1997) (internal quotation marks omitted). "An officer acts with 'deliberate indifference' when he knows that a detainee is in 'serious need of medical care' and does not obtain medical care for that detainee." *Id.*   Whether a delay amounts to a constitutional violation "depends on the nature of the medical need and the reasons for the delay." *Farrow v. West*, 320 F.3d 1235, 1247 (11th Cir. 2003). However, even short delays in obtaining medical care can constitute deliberate

---

[9] It appears that surgery was performed in November of 2012. (Doc. 24-4 at 9-16).

indifference.   Consequently, "a few hours' delay in receiving medical care for emergency needs *such as broken bones* and bleeding cuts may constitute deliberate indifference." *Id*. (emphasis added).   Additionally, an officer who delays necessary treatment for non-medical reasons may also exhibit deliberate indifference.   *Id*. at 1246; *Lancaster*, supra, at 1425.[10]

In this instance, the defendants concede that the plaintiff suffered from an objectively serious medical need; *i.e.*, a broken hand. (Doc, 24 at 10).   They also concede he was provided no tangible medical care for the five or six hour period he was in their custody.   However, they argue they had no "subjective knowledge" of a risk of serious harm, since the plaintiff had failed to see a doctor about his hand prior to his arrest.   (Doc. 24 at 10).   They also contend that there is no evidence pointing to the need for the plaintiff to be taken "immediately" to a hospital, and that there is no "verifying medical evidence" that the delay in doing so resulted in any "detrimental effect."   *Id.* at 10 and 12.   However, these assertions ignore the genuine (and material) issues of (1) whether or not the plaintiff's injury was exacerbated when he fell after being tased; (2) the parties' disagreement over whether or not the paramedics instructed the plaintiff be taken "immediately" for medical care; (3)

---

[10] The defendants cite three cases for the proposition that delay for non-medical reasons can be acceptable where the delay is "because law enforcement is busy performing other law enforcement functions." (Doc. 24 at 14).   However, as discussed *infra*, those cases are clearly distinguishable from the facts before the court here and are not controlling.

whether or not the delay in obtaining medical care was based on the improper motive of forcing the plaintiff to submit to questioning; and (4) whether or not early medical intervention could have prevented the need for orthopedic surgery and the permanent impairment claimed by the plaintiff.[11]  More importantly, it seems clear that even a lay person would understand that a broken hand constitutes a medical emergency mandating urgent care.   Therefore, a reasonable jury could find under the circumstances as presented in the record that the defendants' failure to act was tantamount to an unnecessary and wanton infliction of pain.

The cases cited by the defendants for the proposition that non-medical delays can be appropriate under certain circumstances are clearly distinguishable and unpersuasive.  In *Youmans v. Gagnon*, 626 F.3d 557 (11th Cir. 2010), the detainee "never specifically requested medical treatment" during the three hours he was in the custody of the defendant officer, and despite several cuts and abrasions and "some" visible blood, the court noted he maintained "sufficient use of his hands to sign an acknowledgment of his rights … to open a can of lemonade," and to use the top of the can "in an attempt to unscrew the panel covering the interview room's video camera." *Id*. at 561.  These facts are clearly distinguishable from the instant case in which paramedics confirmed the plaintiff's broken hand and his need to be seen by a

---

[11] The existence of these issues of material fact precludes summary judgment for either the plaintiff or the defendants.

physician, where the plaintiff had clearly verbalized his pain and his request for medical assistance, and where the delay in obtaining medical care is not satisfactorily explained.  More importantly, the court in *Youmans* simply determined that under the specific facts of that case, and "with injuries of the kind asserted," there was no constitutional violation.

Likewise, the defendants' reliance on *Andjur v. Rodriguez*, 486 F.3d 1199 (11th Cir. 2007), is also unfounded.  In *Andjur*, the defendants were paramedics who responded to the scene where the plaintiff/arrestee had been bitten by a police dog. The defendants cleaned and bandaged the arrestee's wounds at the scene before releasing him to the police, and "assumed that the police would transport [him] to a medical facility for further treatment after processing."  *Id*. at 1204.  The court in *Andjur* recognized that the arrestee's medical needs "were not urgent" at the time the defendants released him into custody of the police, and that the defendants' conduct "did not amount to more than mere negligence." *Id*.  By contrast, in this case there is nothing in the record to show the plaintiff received *any* medical care while in the custody of the defendants.  Although paramedics were called, there is no evidence they provided any actual treatment to the plaintiff, but instead instructed the defendants to take him to the hospital.  There is a substantial difference between the facts in *Andjur*, in which paramedics released a detainee into police custody *after*

*rendering aid*, and the record here which contains no evidence of any medical care for a period of at least five hours, despite the existence of a clearly painful and serious injury.

The defendants' reliance on *Jackson v. Capraun*, 534 Fed.Appx. 854 (11th Cir. 2013), is also unfounded. In *Jackson*, the arrestee told officers he was suffering from "acute back pain" after being tackled during the arrest, but was told that he would have to wait until the defendant officer finished the arrest report, a task which was interrupted twice by the officer having to assist in the arrests of other suspects. There, the court could point to specific tasks being performed by the defendant officer which delayed his ability to transport the arrestee to the hospital. Those events are clearly distinguishable from the record in this case, which contains no clear facts which adequately explain the five or six hour delay imposed by the defendants. Additionally, the court in *Jackson* also concluded that the arrestee/plaintiff had failed to adequately show his alleged back injury was such that it would have been obvious to a lay person that he needed treatment, and consequently there was no evidence of a "serious" medical need, a necessary element of a deliberate indifference claim. In this instance, the record is clear that the plaintiff suffered from an outwardly obvious and serious medical injury, a fact the defendants concede.

The facts in this case are more analogous to the decision in *Brown v. Hughes*, 894 F.2d 1533 (11th Cir. 1990), where the court concluded that an "unexplained" delay of "less than a day" in providing treatment for a serious injury constituted a *prima facie* case of deliberate indifference.[12]   The court stated clearly that "[w]hen prison guards ignore without explanation a prisoner's serious medical condition that is known or obvious to them, the trier of fact may infer deliberate indifference." *Id*. at 1538.   Unlike the specific tasks outlined in *Jackson*, the defendants here have not adequately demonstrated that the five or six hour delay in providing medical care to the plaintiff was because they were consumed by necessary police work.   At the very least, there exists a genuine issue of fact with regard to whether or not the defendants' delay in providing medical care was intentional.   The existence of this factual dispute precludes summary judgment.

## V. Recommendation

For the reasons stated above, the magistrate judge RECOMMENDS that the Defendants' special report be construed as a motion for summary judgment, and as such, that it be **DENIED**.   It is further RECOMMENDED that the plaintiff's motion

---

[12] In *Brown*, the prisoner/plaintiff suffered a broken foot, the type of injury which the court noted was serious enough that even brief delay could render the defendants liable "as if they had inflicted the pain themselves." 894 F.2d at 1538.

for summary judgment (doc. 19) be **DENIED** and this action referred to the undersigned for further proceedings.

## Notice of Right to Object

Any party may file specific written objections to this report and recommendation.   Any objections must be filed with the Clerk of Court within fourteen (14) calendar days from the date the report and recommendation is entered. Objections should specifically identify all findings of fact and recommendations to which objection is made and the specific basis for objection.   Failure to object to factual findings will bar later review of those findings, except for plain error.  *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986); *Dupree v. Warden*, 715 F.3d 1295, 1300 (11th Cir. 2013).   Objections also should specifically identify all claims contained in the complaint which the report and recommendation fails to address.   Objections should not contain new allegations, present additional evidence, or repeat legal arguments.   An objecting party must serve a copy of its objections on each other party to this action.

On receipt of objections, a United States District Judge will make a *de novo* determination of those portions of the report and recommendation to which objection is made and may accept, reject, or modify in whole or in part, the findings of fact and

recommendations made by the magistrate judge.  The district judge must conduct a hearing if required by law.  Otherwise, the district judge may exercise discretion to conduct a hearing or otherwise receive additional evidence.  Alternately, the district judge may consider the record developed before the magistrate judge, making an independent determination on the basis of that record.  The district judge also may refer this action back to the magistrate judge with instructions for further proceedings.

A party may not appeal the magistrate judge's report and recommendation directly to the United States Court of Appeals for the Eleventh Circuit.  A party may only appeal from a final judgment entered by a district judge.

**DONE** and **ORDERED** this 4th day of April, 2016.

HARWELL G. DAVIS, III

UNITED STATES MAGISTRATE JUDGE